*In re* R.L.S., a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* R.L.S., Defendant-Appellant.)

Fourth District    No. 14807

Opinion filed September 29, 1978.

CRAVEN, J., dissenting.

Richard J. Wilson and Barbara A. Chasnoff, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert C. Perry and Gary J. Anderson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

Respondent, R.L.S., a minor, appeals an order of the circuit court of Champaign County committing him to the Department of Corrections, Juvenile Division, State of Illinois. He contends that the trial court erred (1) in ordering commitment without first exercising its discretion as to whether to do so, and (2) in denying his request for a continuance of the dispositional hearing.

On September 19 and 26, 1977, separate petitions were filed in the trial court alleging respondent to be a delinquent because of having committed acts of criminal trespass to State-supported land (Ill. Rev. Stat. 1975, ch. 38, par. 21—5(a)), a misdemeanor. On November 9, 1977, respondent stipulated to the truth of the allegations of the petition and the case was continued until January 27, 1978. On November 17, 1977, a third petition was filed alleging an additional commission of the same offenses by respondent. At a contested hearing on November 23, 1977, the court found the allegations of that petition to be true, vacated the January 27, 1978, hearing and continued the case until December 23, 1977. At a hearing on the latter date the court pronounced findings that the best interests of the public and the minor required that he be found to be a delinquent and a ward of the court. These findings were not placed in the common law record by the clerk but are contained in the report of the proceedings and are, therefore, before us on appeal (58 Ill. 2d R. 321). After making further findings the court then committed respondent to the Department of Corrections.

In support of his claim that the trial court erred in failing to exercise discretion, respondent relies on *People v. Saiken* (1971), 49 Ill. 2d 504, 275 N.E.2d 381, and *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168. In *Saiken*, the supreme court stated that after an eligible defendant in a criminal case requests probation, the court is required to exercise its discretion in determining whether to grant the request. In *Bolyard*, the supreme court stated that the trial court had failed to exercise its discretion and erred when an eligible criminal defendant's request for probation was denied for the stated reason that the sentencing judge followed a policy of his predecessors in never granting probation for the offense of which the defendant had been convicted. Here, the respondent argues that the record demonstrates that the trial judge did not exercise his discretion because he had a personal sentencing policy prejudiced against those who commit the offense in question and had been predisposed to make commitment of the respondent from the start.

In order to evaluate respondent's contentions it is necessary to consider the evidence concerning the conduct of respondent which was the subject matter of the petitions. All petitions alleged that respondent had entered the buildings and classrooms at Franklin Middle School in Champaign after being told by authorized school authorities not to do so. The third episode occurred while the dispositional hearing on the first two petitions was pending. The evidence at the hearing on the third petition showed that respondent entered a classroom, refused to leave, called one boy a sissy and asked another boy if he was a boy or girl. The teacher who was present described respondent as a tough boy and indicated that the students were intimidated. The whole episode lasted 15 or 20 minutes. Shortly thereafter, the school principal reported seeing respondent chasing another boy into the school building.

■▌ The trial judge described respondent's conduct as "outrageous," called him a "thug" and stated that he had proceeded to "terrorize" students at the school. The judge also stated that he considered the offenses committed by respondent to be "far more serious" than the burglary offense of breaking into an automobile to steal objects inside the car. The trial court properly considered the disruption of schools to be a serious social problem. It was not improper to describe the conduct as "outrageous." Even if the evidence did not indicate that students were terrorized, it did show them to be intimidated. The use of the slang term "thug" was inappropriate in a juvenile proceeding with reference to the respondent who was not yet 18 but was not erroneous. Although the burglary of an automobile is a felony and the instant offenses were misdemeanors, we are not aware of any rule that requires a juvenile judge to measure the severity of dispositional orders in proportion to the criminal penalties prescribed for the criminal conduct involved. The record indicates that the eventual dispositional order was based upon other considerations in addition to the nature of the offense charged. The record, taken as a whole, does not indicate that the trial judge abused his discretion in the significance he placed on the offense committed and gives no indication that the judge, as in *Bolyard*, had a policy of denying probation for all who committed the offense.

Respondent was nearing his 17th birthday at time of disposition. Before he was 13 years old, he had several adjustments for very minor thefts one of which involved stealing two packs of chewing gum in 1974. On September 29, 1976, he was declared to be delinquent as the result of a theft, the nature of which was not shown, and placed on probation. Two subsequent petitions to revoke probation were filed and each time he was placed in detention and the petitions dropped. On May 27, 1977, the court entered a finding that respondent was beyond the control of his mother, a relative was appointed his guardian, and he was discharged from probation. The probation officer reported that respondent had been

uncooperative while on probation. An evaluation made of respondent by a local mental health clinic described him as "streetwise, devious and dishonest."

After pronouncing the order of commitment, the trial judge stated that he was making a "strong recommendation" to the Department of Corrections that respondent not be given parole but be held until he was 21 years old, that he be locked up and that he be taught a trade. The court stated that he was making this recommendation in view of the various steps that had been taken to help the respondent and his apparent unwillingness to abide by the rules of society. Such a recommendation has no binding effect on parole authorities. Although we deem the recommendation to be harsh, the record indicates that it was not made only because of the types of offenses the respondent had committed.

Respondent also argues that various threats made by the judge to incarcerate him indicate that the court had earlier decided to commit him to the Department of Corrections. At the respondent's first appearance on the first two petitions in the instant case the judge stated to him that he was now "before a different kind of judge" who locked "people up who violate the laws." The judge went on to state that respondent was presumed innocent as far as he was concerned. The judge warned respondent that it was important that he behave during the course of proceedings and told respondent that if he was proved guilty beyond a reasonable doubt and also got into further trouble before the adjudicatory hearing, respondent should "bring your toothbrush, because I'm going to lock you up."

Prior to the contested hearing on the third petition, the court placed the respondent in detention (Ill. Rev. Stat. 1977, ch. 37, par. 703—6(2)). After the court found that the respondent had committed the acts alleged in the third petition, counsel for respondent asked that he be released from detention pending further hearing. The judge stated that in view of the record and a report he had from the detention center he felt that the respondent represented danger to the community. He denied the request. He then addressed the respondent telling him that at the next hearing he would have it in his power to commit the respondent to the Department of Corrections. He admonished the respondent that he did not think that the court had yet obtained the respondent's attention, that it was up to the respondent to behave at the detention center and that if respondent did not do so he would keep him there over Christmas or as long as necessary and might even commit him to the Department of Corrections. The court directed the probation office to investigate the possibilities of such a commitment. He then concluded his lecture to the respondent by saying that respondent had the burden of convincing him that if he released respondent back on the streets, he, respondent, would not continue his prior conduct. He then stated:

"I don't know how you're going to meet that, but you had better

think about it. Because I think I owe it to the citizens of this community to have you locked up behind bars where you are simply removed from society, and the people in the schools can be protected from this kind of conduct. Do you understand that?"

We conclude that the first statement by the judge that he locked "people up" was merely a warning to the respondent that he was a stern judge and would be more likely to take stern measures than other judges that respondent had been before previously. We also conclude that the reference to bring a "toothbrush" was a threat that the respondent would be placed in detention again if he misbehaved before the adjudicatory hearing and was found at that hearing to have committed the acts alleged. The probation report later introduced showed that respondent had been twice placed in detention before. When the trial judge found probable cause that respondent had committed a further crime as alleged in the third petition, the court did put respondent into detention.

The last threat to incarcerate respondent did have some reference to his ultimate disposition. However, it was made in denial of R.L.S.'s request to be released from detention. Moreover, it was also stated in the context of an explanation by the judge that more lenient actions by the court had previously failed to get the defendant's attention and was a warning by the court to the respondent of the serious situation that he was in. The entire statement of the judge indicates that he had not yet made a determination to commit.

■ The record indicates considerable effort made by the court to use other methods of handling respondent rather than making a commitment. Placements with relatives had failed. He committed another offense even in the face of court proceedings. The mental health report had given a poor prognosis. The teacher whose room respondent disrupted described him as an intimidating type of person. The trial judge talked and ruled sternly but we do not determine that he did so because of a fixation upon the offense of trespassing upon school property or the social problems thereby created. He ordered disposition after a lengthy procedure which he conducted carefully. We are satisfied that he did not predetermine that he would make a commitment but did so in the full exercise of his discretion after considering all of the matters before him.

■ Prior to the hearing at which commitment was ordered, respondent's counsel requested a continuance for another month because the report from the detention center indicated that respondent's conduct there was somewhat improved. Respondent argues that he should have been permitted to remain there for another month so that the court might determine then whether he had improved enough so that commitment would not have been necessary. The trial judge denied the request, reasoning that an improvement in conduct while respondent was under

24-hour watch was not of much significance and that a continuance would not likely lead to further helpful information about respondent. The court's ruling was not a breach of discretion.

For the reasons stated, we affirm.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

The dual responsibility of the Illinois courts to juveniles is not an accident of history. It is the result of a considered movement in this country to remove juveniles from the adult criminal system. Nowhere is the responsibility stated more clearly than in the Juvenile Court Act itself.

> "This Act shall be administered in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court." Ill. Rev. Stat. 1977, ch. 37, par. 701—2(2).

The *parens patriae* concept embodied in the Juvenile Court Act authorizes wide discretion to the court in dealing with juvenile problems. Because the trial judge observes the witnesses and parties and is in a position to discern subtleties which are not found in a sterile record, the trial judge's decisions on discretionary matters will only be stricken by appellate courts in cases of abuse. The judge in the proceedings below displayed a lack of understanding of the meaning of *parens patriae* and the policies and purposes of the Juvenile Court Act. Instead of a mindful consideration for the spirit of law, the trial court, as evidenced by his comments throughout, viewed the proceedings in much the same light as a criminal prosecution.

> "The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." B. Cardozo, The Nature of the Judicial Process 141 (1921).

Since the first juvenile court was established in Chicago in 1899, the State of Illinois has made a conscious determination that juvenile proceedings shall not be geared towards striking fear into the hearts of

our youth or toward punishing adolescents for behavior which is substantially less than ideal but rather the proceedings shall recognize that juvenile problems arise from an unsatisfactory environment and that if placed within a proper environment many undesirable characteristics and problems will be resolved to the benefit of the child, its family and society. (*In re Carson* (1973), 10 Ill. App. 3d 384, 295 N.E.2d 740.) Such benefit is long range. Punishment or "revenge" is counterproductive, and, at most, short range in benefit.

The Act is not blind to the fact that for some juveniles a physically restrictive environment is necessary, but it is manifestly clear that a detention disposition of a child adjudicated a delinquent should not be freely or frequently employed. It should be used only upon a mature and studied finding that other dispositional alternatives will not serve the best interests of the child and the public and a finding that the parents are unfit or unable to provide the proper environment for the child. Ill. Rev. Stat. 1977, ch. 37, par. 705—10(1).

At the admonition hearing, which was the respondent's *first appearance on this matter*, the trial judge clearly indicated in the following comments that he was predisposed to place the respondent to the Department of Corrections.

"THE COURT: * * *

Mr. [S], let me suggest to you, I don't know what your previous experience has been in juvenile court, but you're in front of a different judge now. *I lock people up who violate the laws of The State of Illinois.* * * * In the event however the State meets its burden of proving you guilty beyond a reasonable doubt of any of these charges, your behavior between now and November 2nd will be of major consideration by me. If you get into further trouble between now and November 2nd do you understand that?

MINOR RESPONDENT: Yes.

The Court: In the event you do, and in the event the State proves you guilty of this charge, *when you come to court on November 2, bring your toothbrush, because I am going to lock you up.* Do I make myself clear?" (Emphasis added.)

It is indeed difficult to characterize the trial judge's comments at this early stage of the proceedings simply as warnings or threats, as does the majority. The trial judge unequivocally stated that he would "lock the respondent up" if the State proved him guilty of the charge, and if there was further trouble. Moreover, it is inconceivable that the majority could tolerate such a blatant predisposition by the trial judge. Such a personal sentencing policy by the trial judge as is evident here has been rejected by the supreme court because of its inconsistency with the concept of proper

sentencing procedures. (*People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168.) *Bolyard* speaks to a criminal proceeding. This is a civil matter, and juvenile at that.

At the adjudicatory hearing on the third petition, the trial judge again manifested his predisposition by the following comments:

> "THE COURT: * * *
>
> I want you to understand you have the burden now of convincing me if I release you back on the streets there is not going to be this sort of thing occurring again. *I don't know how you are going to meet that, but you had better think about it. Because I think I owe it to the citizens of this community to have you locked up behind bars where you are simply removed from society, and the people in the schools can be protected from this kind of conduct.* * * *" (Emphasis added.)

Again, the majority characterizes these comments as merely a lecture or warning to the respondent rather than any indication of a predisposition by the trial judge. Perhaps one such isolated comment at a hearing could be overlooked. However, these comments cannot be disregarded since the trial judge consistently stated in these two hearings that he would put the respondent behind bars.

Finally, at the dispositional hearing, the trial judge analogized the charges in the delinquency petition, which are equivalent to Class A misdemeanors, to Class 4 and Class 2 felonies.

> "The Court: * * *
>
> His total disregard for the concern and for the rights of others was best demonstrated by his action at the school, which as I have indicated, sounds on paper like a minor offense, *but is in my judgment one of the most serious things that has come across this desk. It's a far more serious offense than many of the thefts and burglaries and other things of this kind where someone has broken into some car and taken out a tape deck.* It's far more serious, not just because of what occurred, but because of where it occurred. * * * Or to put it another way, they will be free from molestation by thugs such as this minor respondent, * * *.
>
> I don't see any reason why I should have any sympathy for this minor respondent. And I frankly don't. * * *" (Emphasis added.)

From this comment it is evident that the trial judge incorrectly viewed this proceeding as a criminal prosecution. Moreover, in considering the specific charges in the petitions, it is obvious that the charges can hardly be compared to the serious offenses of felonies mentioned.

The State in its brief argues that the respondent's prior misconduct was properly considered and was such as to warrant the disposition imposed. The record does reflect that this juvenile has been before the juvenile

court in Champaign County several times. In 1972, at age 11, he apparently took a toy truck from a residence and was required to return it. In 1973, at age 12, there was a "station adjustment." The nature of the conduct is not disclosed. In 1974, in an action described as theft, it appears that the respondent took two packs of gum from an Eisner's store. He was then 13 years old. The record is not exactly clear, but it appears that a 1977 petition alleging burglary from a motor vehicle was filed but was ultimately dismissed by the State. The other appearances relate to the conduct with which we are here concerned.

The ultimate error at the dispositional hearing was the trial judge's gratuitous and hopefully meaningless comment that the respondent should remain in the Department of Corrections until age 21—a period of over four years. Had the respondent been tried as an adult criminal and convicted, the maximum sentence that could have been imposed would have been one year. Should the trial judge's recommendation be followed, this juvenile will be punished more severely than an adult convicted of the same offense.

As noted previously, it is not the purpose and policy of the Juvenile Court Act to threaten and intimidate respondents. Rather, the purpose is to administer the Act in a spirit of humane concern affording at least same procedural rights to juveniles as those afforded to adult offenders.

It is clear to me that the dispositional hearing was but an empty formality. The disposition had been determined.

Accordingly, I would vacate the disposition and remand this cause for a dispositional hearing before a different judge.